Filed 5/18/21  P. v. Lewis CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOEL LADON LEWIS,<br><br>    Defendant and Appellant. | C085621<br><br>(Super. Ct. No. SF110732A,<br>STK-CR-FECOD-2009-<br>0005429) |

A jury convicted defendant Joel Ladon Lewis and Gerell Whatley of crimes in connection with a series of armed robberies that occurred in October 2008.  Finding that errors were committed during defendant's competency trial, this Court reversed defendant's conviction in 2015 and remanded for a second competency hearing.  In 2016, a jury found defendant competent to stand trial and defendant was convicted of first degree murder, two counts of second degree robbery, delaying or obstructing a public officer, and unlawful firearm activity.  The jury found true the special circumstance

1

allegation that the murder of Michael Rutledge was committed during the commission of a robbery, within the meaning of Penal Code section 190.2, subdivision (a)(17)(a).[1]

Defendant now contends (1) the trial court abused its discretion in denying his request to continue the competency trial; (2) the trial court erred in denying his request for a pinpoint instruction to clarify the meaning of "ability to rationally assist counsel;" (3) the evidence supporting the felony-murder special-circumstance finding was insufficient; and (4) the probation report must be corrected to reflect certain changes the trial court agreed to make.

We conclude (1) the trial court did not abuse its discretion in finding no good cause to continue the competency trial; (2) the trial court did not err in refusing to give defendant's special jury instruction; (3) defendant's sufficiency of the evidence challenge has no merit; and (4) the probation report must be corrected. We will affirm the judgment and direct the trial court to correct the probation report.

BACKGROUND

The People charged defendant with a series of crimes committed in July and October 2008. All dates below refer to 2008. We discuss facts relevant to the competency trial claims in the Discussion section.

On July 1, Adrienne W. reported that someone in a green Jeep Cherokee pointed a rifle at her as the vehicle drove slowly by her home. Adrienne told police the driver's name was Gerell Whatley. She described Whatley as a black male in his 20's with short hair. She described the passenger of the Jeep Cherokee as a black male in his 20's with braids in his hair. Police stopped a Jeep Cherokee within about an hour later. Defendant and Whatley were in the vehicle. Adrienne identified Whatley as the driver and defendant as the passenger of the Jeep Cherokee that drove by her home. A loaded rifle

---

[1] Subsequent undesignated statutory references are to the Penal Code.

2

was concealed under the back passenger seat of the vehicle.  Police found two expended .9 millimeter shell casings for a handgun in the passenger's side area of the vehicle.

At 9:20 p.m. on October 16, two African American men, about 20 to 25 years in age, robbed Jose M. after he parked his car outside his home in Stockton.  One robber pointed a black semiautomatic gun at Jose.  A second robber searched Jose's pockets and removed his wallet.  The robbers ran to a light-colored, four-door car.

Later the same evening, a masked gunman confronted Margarito L. outside his home in Stockton, about five miles from Jose M.'s house.  Margarito ran toward his garage but encountered a second masked man with a gun.  Margarito hit the second man with his hand, causing the man's mask to come off.  Both men hit Margarito and took his wallet from his pocket.  Margarito described one robber as a young black male with a shorter Afro and the second robber as a young black male with shoulder-length braids.  Margarito described the suspect vehicle as a brown four-door sedan.

Margarito L.'s wife and son came out of the house during the robbery and saw a man pointing a gun at Margarito.  That man did not have anything covering his face and wore braids in his hair.  He pointed a semiautomatic gun at Margarito's wife and son.  Margarito's son rushed back inside the house and called 911.  He heard two gunshots from the direction of a nearby alley during the call.

Margarito's son identified defendant as the gunman from a photographic lineup on October 23.  Margarito's wife also identified defendant as the gunman.  Margarito identified defendant as the robber whose mask came off.

Cynthia B. heard the sound of running as she was about to enter the alley near Margarito L.'s street at about 10:30 p.m. on October 16.  She saw a car in the alley with both doors open.  She heard a male voice say, "Shoot her.  Shoot her."  Then she heard a gunshot coming from the direction of the male voice.  A .9 millimeter shell casing was subsequently found in the alley, and a black ski mask was found in Margarito's yard.

3

Two dark-skinned men rushed into Peter C.'s garage when he returned to his home in Stockton at about 10:30 p.m. on October 17. One man pointed a black semiautomatic handgun at Peter and ordered Peter to surrender his money. The other man did not have a gun. The unarmed robber took Peter's cell phone from his pocket. The robbers took Peter's wallet and phone and ran away. Peter ran after the robbers, yelling, "robbery, robbery." He saw the robbers run to a light-colored car. A robber pointed a gun at Peter and fired three shots at him. Police recovered three .9 millimeter shell casings in the street and sidewalk area.

Video surveillance showed a man in a gold Dodge Stratus using Peter C.'s credit card at a Shell gas station at about 11:32 p.m. The man in the video resembled Whatley. The Dodge Stratus was later found at 406 South Orange Street; in it, officers found a receipt for a gas purchase made at 11:32 p.m. on October 17, at a Shell Gas Station in Stockton using Peter's credit card.

During the evening of October 18, Armando C. was drinking beer in the driveway of his home in Stockton with Baltazar A., Jose G. and Javier A., when the group was attacked by two to four black men. A black man approached Javier with a gun and said something about money in English that Javier did not fully understand. The gunman shot Javier. A .9 millimeter shell casing was later found in the sidewalk area.

The casings collected from the Jeep Cherokee on July 1 and from the Margarito L., Peter C. and Javier A. robberies were of the same caliber. The casings were fired from the same firearm.

Armando C. heard a gunshot at the same time he heard one of the robbers yell for the victims to get on the ground. One of the robbers grabbed Armando's neck, threw him on the ground and took his cell phone and money from his pants pocket. Jose G. ran to the backyard, pursued by one of the robbers who pointed a gun at him, took his wallet and hit him with a gun. Another robber was also in the backyard beating Baltazar A.

4

The robber threw Baltazar to the ground, hit him with a gun and searched his pants pockets. Jose G. saw one gun. Baltazar said both robbers had small caliber handguns.

Around 7 or 8 p.m. on October 20, two 18-to-22-year-old black men robbed Francis S. on his driveway. Francis saw a third person standing closer to the street. One robber had a silver revolver. The robber had his finger on the trigger and pointed the gun at Francis. Both men searched Francis's pockets. The robbers wore bandanas partially covering their faces, but Francis could see the gunman's eyebrows, nose and eyes. The unarmed robber took a watch, car keys and wallet from Francis's pants pockets. He gave the wallet to the gunman. The gunman repeatedly demanded Francis's PIN number but Francis could not remember it. The unarmed robber convinced the gunman to leave.

Francis followed the robbers. He saw an older model white or cream four-door Dodge with three occupants. The car took off and Francis followed it in his vehicle. Three gunshots were fired in Francis's direction from the front passenger seat of the Dodge. Francis saw movement by the front passenger and then the driver's rear passenger door opened and three more shots were fired in Francis's direction. One of the shots hit Francis's windshield, prompting Francis to end his pursuit. A few days after the robbery, Francis saw photographs of three robbery suspects in the newspaper and recognized defendant and Whatley as the men who robbed him. Francis identified defendant as the gunman.

Between midnight and 1 a.m. on October 22, William Y. was robbed in the driveway of his home in Stockton. Two men wearing ski masks came up to him after he parked his car. The men told William to give them his money. Yee felt the barrel of a gun against his head. The men searched Williams's pockets and took Williams's money, cell phone and Palm Pilot. William was hit on the head and rendered unconscious.

David W. was working in an empty house in Stockton at about 1:30 a.m. on October 22 when a young black man with a gun entered the house. The gunman wore a ski mask but David could see part of his face. The gunman pointed an old revolver at

5

David and demanded money. Another young black man wearing a mask came from the back of the house. The second robber did not have a gun. The gunman was in control and told the unarmed robber what to do. David gave the robbers his wallet. The unarmed robber searched David's pockets and took his cell phone. David later recognized the robbers from a newspaper article with their photographs. David identified defendant as the gunman.

Michael Rutledge worked for the Federal Bureau of Prisons. He left his house for work at about 4:30 a.m. on October 22. Neighbors heard a gunshot between 4:17 and 4:30 a.m. Waste management employees saw Rutledge lying face down in the grass and the door of his pickup truck open at about 5:30 a.m. His wallet was missing.

Rutledge died as a result of a gunshot wound to his head. He was kneeling, lying down or bent over when he was shot. The gun was at least 18 to 24 inches from him at the time of the shooting. He also had injuries to his thigh, groin area, forearm, finger, forehead, face and nose. It was more likely than not that he received those injuries before he was shot.

Bank records showed activity on Rutledge's San Francisco Police Credit Union debit card at Country Marketplace (a gas station), VANCO Trucking, and Bank of America in Stockton starting at 5:14 a.m. The last activity occurred at 5:34 a.m. There was also activity on Rutledge's Washington Mutual debit card at 5:18 a.m.

Video surveillance from VANCO Trucking showed defendant and another person exiting a green Jeep Cherokee around the time of the withdrawals. Video surveillance from Bank of America at the time Rutledge's debit card was used showed an African American female. Delisa Bryant subsequently identified herself and defendant in the VANCO Trucking video and herself in the Bank of America video.

Officers detained defendant and Bryant at 406 South Orange Street in Stockton on October 22. Defendant lived at that address with Bryant, Bryant's young children, her niece Brittany G., defendant's mother M.Q. and defendant's brother.

6

Rutledge's wallet was found under a dresser in the northeast bedroom of the South Orange Street house. A silver .38 caliber Smith & Wesson revolver with five live rounds was found in the southeast bedroom. Letters with defendant's name and Bryant's driver's license were also found in the southeast bedroom. In addition, a ski mask and William Y.'s cell phone and Palm Pilot were found in the house.

The revolver was old but in good working condition. The bullet fragments recovered from Rutledge's head could have been fired from that revolver. The People presented evidence of photographs and a video showing defendant and Whatley with firearms and with persons wearing ski masks. Bryant testified she had seen defendant with "an old-fashioned gun" and Whatley with a black gun.

There was a gold Dodge Stratus registered to Bryant at the house. Defendant's fingerprints were found on the front passenger door and left rear window of that vehicle.

Bryant's and Brittany G.'s pretrial statements and trial testimony established the following. Bryant was in Elk Grove the week before October 22 with her children, Brittany and M.Q. Whatley drove her Dodge Stratus when she was out of town. Bryant returned to the South Orange Street house the evening of October 21. Defendant and his brother were at the house. Whatley arrived at the house later. Defendant and Whatley left the house at some point. At 4:14 a.m., Bryant sent Whatley a text asking to borrow $20. Whatley responded, "If we hit. It's dry right." Defendant and Whatley returned to the house sometime in the early morning and asked Bryant to go with them to use some credit cards. Defendant or Whatley gave Bryant a bank card and PIN number. Defendant, Whatley and Bryant used the card at three places. Defendant and Whatley asked Bryant to "put up" a wallet, which she hid under a dresser in her children's bedroom. Defendant gave Brittany a white cell phone and Bryant a Palm Pilot.

The jury convicted defendant of the first-degree murder (§ 187, subd. (a) -- count 1) and second degree robbery (§ 211 -- count 2) of Rutledge, delaying or obstructing a public officer (§ 148 -- count 3), second degree robbery of William Y.

7

(§ 211 -- count 16) and unlawful firearm activity occurring on July 1 (§12021, subd. (e) -- count 19). The jury found true the special circumstance allegation that the Rutledge murder was committed during the commission of a robbery, within the meaning of section 190.2, subdivision (a)(17)(a). The trial court declared a mistrial as to the other counts and allegations because the jury could not reach a unanimous verdict on those counts and allegations.

The trial court sentenced defendant to life in prison without the possibility of parole on count 1. It imposed and stayed a five-year, concurrent prison term on count 2 and imposed a sentence of 360 days in county jail on count 3, a five-year concurrent prison term on count 16, and a three-year concurrent prison term on count 19.

DISCUSSION

I

Defendant argues the trial court abused its discretion in denying his request to continue the competency trial to secure the attendance of prisoner witnesses who helped him write grievances when he was in prison. He says the expected testimony of the prisoner witnesses would have shown that he was unable to assist his counsel at the trial.

A

Two days before the start of defendant's competency trial, defendant's trial counsel said it appeared from the witness list she just received that the People intended to introduce evidence of grievances defendant filed when he was incarcerated at Pelican Bay Prison. Defendant's trial counsel objected that the grievances were not relevant to defendant's then-current competence. The prosecutor disagreed. After the prosecutor specified the dates of certain grievances, defendant interjected that he did not write the grievances and mentioned his "cellies." The trial court ruled that the grievances were relevant and evidence of the grievances was admissible under Evidence Code section 352. Defendant does not challenge that ruling on appeal.

8

Defendant's trial counsel moved for a continuance two days later, which was the first day of the competency trial. She said defendant's cellmate Justin Morgan recently told defendant's mother that Morgan prepared one or two of the grievances at issue and another prisoner (Charles Williams) helped draft them. Counsel argued that if the grievances were admitted, evidence that defendant did not author the grievances was relevant, and the Department of Corrections required a minimum of three weeks to transport prisoners to court. Defendant clarifies on appeal that he disputed writing the prison grievances but not a 2016 jail grievance.

The prosecutor initially argued that the identity of the author of the grievances was relevant but ultimately said she would be satisfied if she could introduce evidence about "what a grievance is, the rights of people to use them, what ordinarily they are used for," that grievances were filed on behalf of or by defendant and the subsequent communications about the grievances.

The trial court concluded that authorship of the grievances was not important because regardless of who wrote the grievances, the key was whether defendant was able to rationally discuss the grievances with staff. It said, "Because here we are literally the day of trial. We have 125 jurors downstairs right now waiting to come up. And the question is whether or not this mandates a continuance." The trial court expressed concern about the amount of time it would take to transport prisoner witnesses. It said it was willing to do anything to help the defense transport the witnesses to court, but the issue of authorship was a collateral one and the significant evidence would come from the psychiatrists and psychologists. The trial court declined to continue the trial. It ruled there would be no miscarriage of justice if the prisoner witnesses were not called at the trial.

Defendant's trial counsel informed the trial judge on the third day of the competency trial that her investigator interviewed Justin Montgomery at Pelican Bay Prison and Montgomery said he prepared two of the grievances for defendant.

9

Defendant's trial counsel said the prison required 30 days to transport Montgomery to the court. The prosecutor objected to a 30-day continuance. She argued the author of the grievances was not important and what was important was that defendant used and participated in the grievance process to get what he wanted. Defense counsel countered that it would not be necessary to call the prisoner witnesses if the prosecutor limited her evidence to testimony by prison staff about receipt of the grievances and what happened at the hearing on the grievances. The prosecutor said she would not introduce the actual grievance forms. The trial court ruled the testimony of the prisoner witnesses was not crucial and the request to continue was not timely.

B

"Continuances shall be granted only upon a showing of good cause." (§ 1050, subd. (e).) A trial court has broad discretion in determining whether good cause exists to continue a trial. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037 (*Jenkins*); *People v. Smithey* (1999) 20 Cal.4th 936, 1011.) Discretion is abused only when the court exceeds the bounds of reason, all circumstances considered. (*People v. Beames* (2007) 40 Cal.4th 907, 920 (*Beames*).)

In deciding whether to grant or deny a motion for a continuance, the trial court must consider the benefit which the moving party anticipates, the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and whether substantial justice will be accomplished or defeated by granting the motion. (*Jenkins, supra*, 22 Cal.4th at p. 1037; *People v. Barnett* (1998) 17 Cal.4th 1044, 1125-1126 (*Barnett*).) "When a continuance is sought to secure the attendance of a witness, the defendant must establish 'he[or she] had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven.' " (*Jenkins,* at p. 1037.)

10

A trial court's denial of a motion for continuance is reviewed for abuse of discretion. (*Jenkins, supra*, 22 Cal.4th at p. 1037.) The party challenging the trial court's ruling bears the burden of establishing an abuse of discretion and prejudice. (*Beames, supra,* 40 Cal.4th at p. 920; *Barnett, supra,* 17 Cal.4th at p. 1126.) An order denying a continuance is seldom successfully attacked. (*Beames,* at p. 920*.*)

It appears from the record that defendant exercised due diligence in attempting to secure the attendance of Montgomery and Williams. Contrary to the Attorney General's assertion, this Court's opinion on defendant's prior appeal did not put defendant on notice that the prosecutor would seek to admit prison grievances to prove defendant's mental competency at a subsequent trial. That opinion said law enforcement and correctional officers testified they had been able to communicate with defendant at various times and correctional officers overheard defendant communicate with fellow prisoners and visitors, but did not mention grievances filed by defendant. (*People v. Lewis* (Apr. 30, 2015, C064781) [nonpub. opn.].)

However, it was unclear what Williams would say and, thus, whether he had material testimony and whether Williams's testimony could be obtained within a reasonable period of time. The report by defendant's trial counsel about Montgomery's statement to a defense investigator did not mention Williams. Counsel said the prison required 30 days to transport Montgomery. Even if 30 days was a reasonable time for a delay, there was no information about where Williams was and how long it would take to obtain Williams's attendance at the trial.

More important, the expected testimony by Montgomery that defendant did not write the Pelican Bay Prison grievances was immaterial. Materiality refers to the relationship of the evidence to a matter which is of consequence to the determination of the action. (*People v. Hill* (1992) 3 Cal.App.4th 16, 29, disapproved on another ground in *People v. Nesler* (1997) 16 Cal.4th 561, 582, fn. 5.) "[M]ateriality depends on the issues in the case; evidence which does not relate to a matter in issue is immaterial."

11

(*Ibid.*, italics omitted.) The purpose of the competency trial was to determine whether as a result of a mental health disorder or developmental disability, defendant was "unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

Defendant's trial counsel conceded it would not be necessary to call the prisoner witnesses if the prosecutor limited her evidence to testimony by prison staff about receipt of the grievances and what happened at the grievance hearings. The prosecutor agreed not to introduce the actual grievance forms, stating that defendant's use of, and participation in, the grievance process and not the authorship of the grievances was the ultimate issue. Given the concessions by defendant's trial counsel and the prosecutor, the trial court did not abuse its discretion in ruling that the expected testimony by Montgomery was immaterial to defendant's ability to understand the nature of the proceedings against him or to assist his counsel in a rational manner.

We need not consider whether the fact to which Montgomery was expected to testify could not otherwise be proven because that fact was immaterial. Considering all of the circumstances, defendant fails to establish that the trial court abused its discretion in finding no good cause to continue the trial.

Defendant contends, without elaboration, that the denial of his motion for a continuance violated his rights to a fair trial, to produce defense evidence and to the effective assistance of counsel. We reject defendant's constitutional challenges because the trial court acted within its broad discretion in denying a continuance. (*People v. Roldan* (2005) 35 Cal.4th 646, 671, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Howard* (1992) 1 Cal.4th 1132, 1172.)

## II

Defendant next argues the trial court erred in denying his request for a pinpoint instruction to clarify that "ability to rationally assist counsel" includes the ability to understand the facts of the case and one's basic constitutional rights.

12

The trial court instructed the jury with CALCRIM No. 3451 as follows: "You must decide whether the defendant is mentally competent to stand trial. That is the only purpose of this proceeding. Do not consider whether the defendant is guilty or not guilty of any crime or whether he was sane or insane at the time that any alleged crime was committed. [¶] The defendant is mentally competent to stand trial if he can do all of the following: [¶] One, understand the nature and purpose of the criminal proceedings against him; [¶] Two, assist in a rational manner his attorney in presenting his defense; [¶] And, three, understand his own status and condition in the criminal proceedings. [¶] The law presumes that a defendant is mentally competent. In order to overcome this presumption, the defendant must prove that it is more likely than not that the defendant is now mentally incompetent because of a mental disorder."

Defendant's trial counsel objected that the CALCRIM No. 3451 instruction did not define "ability to rationally assist counsel." Defendant proposed the following special jury instruction: "The standard for competence to stand trial is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him such that he can assist in preparing his defense. [¶] Rational assistance includes, but is not limited to, the decision whether to rationally waive the privilege against compulsory self-incrimination, whether to rationally waive the right to a jury trial, whether to confront accusers or not, whether (and how) to put on a defense and whether to raise one or more affirmative defenses."

The People objected to the proposed instruction as unnecessary. The trial court refused to give the requested instruction, concluding that CALCRIM No. 3451 covered the issue, but said it would revisit the issue if the jury had questions. The jury did not submit any questions.

"The due process guarantees of both the federal and state Constitutions forbid the trial of a criminal defendant while he or she is mentally incompetent." (*People v.*

13

*Buenrostro* (2018) 6 Cal.5th 367, 385 (*Buenrostro*).) The United States Supreme Court established the test for competence to stand trial in *Dusky v. United States* (1960) 362 U.S. 402 [4 L.Ed.2d 824] (*Dusky*): "it is not enough for the district judge to find that 'the defendant [is] oriented to time and place and [has] some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him.' " In California, a defendant is mentally incompetent "if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

As defendant points out, the first sentence of his proposed instruction tracks the language of *Dusky*. But CALCRIM No. 3451 is consistent with section 1367 and the California Supreme Court has held that even though section 1367 does not match the test articulated in *Dusky* word for word, " ' "[t]o anyone but a hairsplitting semanticist, the two tests are identical." ' " (*People v. Dunkle* (2005) 36 Cal.4th 861, 893 (*Dunkle*), disapproved on another point in *People v. Doolin, supra*, 45 Cal. 4th at p. 421, fn. 22; see also *Buenrostro, supra,* 6 Cal.5th at p. 386.)

Defendant argues that the trial court should have included an instruction to clarify that "ability to rationally assist counsel" includes the ability to understand the facts of the case and one's basic constitutional rights. The California Supreme Court has rejected the contention that CALJIC No. 4.10, which mirrors CALCRIM No. 3451, is deficient because it omits the requirements of " 'a rational as well as factual' " understanding of the proceedings, as set forth in *Dusky*. (*Buenrostro, supra,* 6 Cal.5th at p. 390.) Like CALCRIM No. 3451, CALJIC No. 4.10 informed the jury that its task was to " 'decide whether the defendant is mentally competent to be tried for a criminal offense' " and explained that " 'a person charged with a criminal offense is deemed mentally competent to be tried for the crime charged against [him or her] if, one, [he or she] is capable of

14

understanding the nature and purpose of the proceedings against [him or her]; two, [he or she] comprehends [his or her] own status and condition in reference to such proceedings; and, three, [he or she] is able to assist [his or her] attorney in conducting [his or her] defense in a rational manner.' " (*Buenrostro,* at p. 385.)  The Supreme Court held that the CALJIC 4.10 instruction was not infirm merely because it did not focus specifically on the defendant's " 'rational and factual' " understanding of the proceedings. (*Buenrostro,* at p. 390.)  It concluded that " 'one's ability to grasp the nature of the proceedings necessarily encompasses one's capacity to have a rational and factual understanding of the proceedings.' " (*Ibid.*)

The Supreme Court has also rejected a challenge to the CALJIC No. 4.10 instruction on the ground that it did not explain the various constitutional rights implicated in a criminal trial and failed to tell the jury how much and what kind of assistance a defendant must be able to provide counsel.  (*Dunkle, supra*, 36 Cal.4th at p. 894.)  In particular, the California Supreme Court held that the words "assist" and "rational manner" as used in the CALJIC No. 4.10 instruction were not technical terms that required instruction by the trial court.  (*Dunkle,* at pp. 894-896.)

We conclude, consistent with *Buenrostro* and *Dunkle*, that the CALCRIM No. 3451 instruction given in this case adequately informed the jury of the required findings under section 1367.  The requisite findings of the defendant's ability to "understand the nature and purpose of the criminal proceedings against him," "assist, in a rational manner, his attorney in presenting his defense" and "understand his own status and condition in the criminal proceedings" described in CALCRIM No. 3451 encompassed the defendant's ability to understand the facts of the case against him and his basic constitutional rights.  The trial court did not err in refusing the requested pinpoint instruction.

Because we have concluded that defendant failed to show any error at his competency trial, he does not show cumulative prejudice arising from the asserted errors.

15

## III

Defendant also challenges the sufficiency of the evidence supporting the felony-murder special-circumstance finding. He says the evidence did not show the identity of Rutledge's shooter and did not show that he aided and abetted the robbery of Rutledge with intent to kill or with reckless indifference to human life.

In determining whether sufficient evidence supports a conviction, " 'we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- evidence that is reasonable, credible and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] . . . "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.]' " (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) We do not reweigh evidence. (*Ibid.*) " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.) The effect of this standard of review is that a defendant challenging the sufficiency of the evidence to support his or her conviction bears a heavy burden on appeal. (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1287.) The same standards apply in evaluating the sufficiency of the evidence to support special circumstance findings. (*People v. Banks* (2015) 61 Cal.4th 788, 804 (*Banks*); *People v. Booker* (2011) 51 Cal.4th 141, 172.)

16

The jury convicted defendant of the first degree murder of Michael Rutledge and found true the section 190.2, subdivision (a)(17)(A) special circumstance. Section 190.2, subdivision (a)(17)(A) (hereafter the robbery felony-murder special circumstance) provides that a defendant convicted of murder in the first degree shall be sentenced to death or imprisonment in the state prison for life without the possibility of parole if the trier of fact finds true the special circumstance allegation that the murder was committed while the defendant was engaged in or was an accomplice in the commission or the immediate flight after committing a robbery. The enhanced punishment in section 190.2 applies to actual killers and to certain aiders and abettors. (*Banks, supra*, 61 Cal.4th at p. 797.)

A defendant who is an actual killer and as to whom the robbery felony-murder special circumstance is found true is subject to enhanced punishment without a showing that he/she had any intent to kill. (§ 190.2, subd. (b).) Considering the record in the light most favorable to the judgment, there was substantial evidence from which a jury could reasonably find that defendant was Rutledge's actual killer.

Margarito L.'s son described the gunman at his father's October 16 robbery as a man with braids in his hair. Defendant wore braids. Whatley had short hair. Margarito's son identified defendant as the gunman in a photographic lineup a week after the robbery.

Defendant, Whatley and a third individual robbed Francis S. on October 20. Defendant pointed a revolver at Francis during the robbery. Francis saw only one gun. Six gunshots were fired at Francis as he pursed the robbers.

About three hours before the October 22 Rutledge murder, two men wearing ski masks robbed William Y. and David W. in separate incidents. One of the William robbers had a gun. A robber pointed a revolver at David. Only one of David's robbers had a gun. David identified defendant as the robber with the gun. He identified Whatley as the unarmed robber. William and David testified that the revolver found during a search of defendant's residence looked like the gun used during their robberies. The

17

revolver was found in a bedroom where letters addressed to defendant were also found. David identified a ski mask found in defendant's home as the type of ski mask defendant wore during David's robbery. The white cell phone and Palm Pilot the robbers took from William were also found in defendant's home. According to Bryant, defendant gave Brittany G. a white cell phone and Bryant a Palm Pilot on October 22, the same day as the William robbery.

Rutledge was shot in the head once, approximately three hours after David W.'s robbery. The revolver found inside defendant's residence was missing one bullet. The bullet fragments recovered from Rutledge's head could have been fired from that revolver. Rutledge's wallet was found hidden under a dresser in defendant's home.

It is true that there were no eyewitnesses to the Rutledge robbery and killing. However, a jury could reasonably find based on all of the above that defendant was the gunman who robbed Margarito L. on October 16, Francis S. on October 20 and David W. on October 22; that about three hours after robbing David, defendant robbed Rutledge using the revolver he used during the Francis S. and David W. robberies; that consistent with the Francis S. and David W. robberies, only defendant was armed during the Rutledge robbery; and that defendant shot Rutledge.

Section 190.2 contains an actus reus and a mens rea requirement for aiders and abettors. (*Banks, supra*, 61 Cal.4th at p. 798.) A defendant who is not an actual killer is subject to enhanced punishment under the robbery felony-murder special circumstance if he or she (1) aids and abets another in the commission of first degree murder with the intent to kill (§ 190.2, subd. (c)) or, as is applicable here, (2) aids and abets the commission of a robbery as a major participant, with reckless indifference to human life; the robbery results in the death of a person; and the defendant is found guilty of murder in the first degree (§ 190.2, subd. (d)).

"Major participant" means the defendant's personal involvement in the crime is substantial. (*Banks, supra*, 61 Cal.4th at p. 802.) The trier of fact must consider the

18

totality of the circumstances in deciding whether the defendant was a major participant. (*Ibid.*) "Reckless indifference to human life" means the defendant " ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death," ' " was "aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create" or " 'subjectively appreciated that [his] acts were likely to result in the taking of innocent life.' " (*Id.* at p. 801.) The factors that may be weighed in determining whether a defendant was a major participant who acted with reckless indifference to human life include: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

Applying the sufficiency of the evidence standard of review, there was substantial evidence from which a reasonable trier of fact could find beyond a reasonable doubt that if he was not the actual shooter during the Rutledge robbery, defendant aided and abetted the robbery as a major participant and acted with reckless indifference to human life. A string of robberies occurred in Stockton on October 16, 17, 18, 20 and 22, leading up to Rutledge's death on October 22. Those robberies shared many features. All of the witnesses, except William Y., described black or dark-skinned male robbers. All of the robberies save one occurred on the driveway or in the garage of the victims' homes. All of the robberies occurred at night or in the very early morning. All of the robberies involved the use of a firearm.

19

Victims of three robberies -- October 16 (Margarito L.), 20 (Francis S.) and 22 (David W.) -- identified defendant as one of the robbers. In fact, they said defendant was the gunman. Defendant's fingerprints were found on the Dodge Stratus connected to the October 17 (Peter C.) robbery.

In addition to eyewitness identifications, property found at defendant's residence on October 22 connected defendant to the October 22 crimes and showed he played a substantial role in those robberies. Police found the cell phone and Palm Pilot robbers took from William Y. in defendant's house. Defendant gave Brittany G. a cell phone and Bryant a Palm Pilot on the day of the William Y. robbery. Police also found Rutledge's wallet in defendant's house. Defendant, Whatley and Bryant used Rutledge's debit card the morning of Rutledge's killing. A total of $360 was withdrawn using Rutledge's debit card. Police found $230 in cash on defendant when they searched his person on October 22. A revolver consistent with the bullet fragments recovered from Rutledge's head was found in a room associated with defendant. That revolver looked like the gun used in the William Y. and David W. robberies.

Even if defendant was not the gunman, Jose M., Margarito L. and his family, Peter C., Francis S. and David W. testified that the unarmed robber searched the persons of the victims and/or took their property on October 16, 17, 20 and 22. Margarito testified that both robbers hit him. Jose G. testified that while one robber beat him, the other was beating Baltazar A. during the October 18 robbery. Therefore, if he was not the gunman, defendant was not like a mere getaway driver who waited away from the scene of the robberies. (*Banks, supra*, 61 Cal.4th at pp. 799, 802-803 [distinguishing the facts of *Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140] from those of *Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127].) Both robbers played an active and substantial role in the robberies.

If he was not the gunman, defendant would also have known that the gunman used lethal force in the robberies preceding the Rutledge murder because both robbers were

20

present when a gun was pointed at the victims of the robberies preceding the Rutledge robbery and property was taken from the victims' persons, Javier A. was shot during the October 18 robbery, and shots were fired at the victims and a bystander after the October 16, 17 and 20 robberies, indicating that the gunman was willing to use lethal force to commit robbery and escape. Someone shouted "shoot her" before shots were fired at a bystander as the robbers fled the scene of the October 16 Margarito L. robbery. Multiple shots were fired at Peter C. on October 17 and Francis S. on October 20 when they pursued the robbers, indicating an intent to kill. (*People v. Vang* (2001) 87 Cal.App.4th 554, 556, 563-564 [spraying house with bullets from high-powered rifles manifested an intent to kill].)

Additionally, some robbery victims were brutally assaulted. Margarito L. had a gun pointed at his head. He was beaten so badly he could hardly walk two or three days after the robbery. Jose G. and Baltazar A. were severely beaten by two robbers. A robber hit William Y. on the head, probably with the butt of a gun, rendering William unconscious. Rutledge was shot in the head. But he also had injuries to his thigh, groin, forearms, finger and nose, indicating he was violently assaulted.

Rutledge would possibly have survived if he had received immediate medical aid after he was shot. Garbage truck drivers found him lying face down in the grass at least 39 minutes after he was shot and called 911. There was no evidence that defendant stayed at the scene to help Rutledge or that he called 911. (*People v. Smith* (2005) 135 Cal.App.4th 914, 927-928 [considering the defendant's flight and not aiding the victim or summoning help in concluding that the defendant acted with reckless indifference to human life]; *People v. Proby* (1998) 60 Cal.App.4th 922, 929-930 [same].) Instead, defendant accompanied his cohorts to different locations to use Rutledge's debit cards.

Based on all of the above, a reasonable trier of fact could find beyond a reasonable doubt that if defendant was not the actual killer, he was an aider and abettor who had

21

substantial involvement in the Rutledge robbery and he was aware of and was willingly involved in the violent manner in which the Rutledge robbery was committed, demonstrating a reckless indifference to human life.

IV

Defendant also contends the probation report must be corrected to (1) strike references to the 2010 guilty verdicts reversed in his first appeal; (2) correct page one to show the offenses of which he was convicted in 2017; (3) change the word "bombarded" on page 11 to "attacked;" and (4) strike the California Rules of Court, rule 4.421(a)(3) factor on page 12. The Attorney General agrees the corrections should be made.

Defendant's trial counsel requested certain corrections to the probation report and the trial court agreed to make those corrections. First, the trial court agreed to strike references to the February 19, 2010 guilty verdict on page three of the report because this Court reversed those convictions. (*People v. Lewis, supra*, C064781.) Second, the trial court agreed to change the sentence on page 11 of the report that the victim was "bombarded" by deleting the word "bombarded." Finally, the trial court agreed to strike the statement on page 12 of the report concerning aggravating factor (a)(3) because of a lack of evidence supporting such fact. The corrections were not made.

A probation report should contain accurate information. (*People v. Lutz* (1980) 109 Cal.App.3d 489, 497.) A probation report containing inaccurate information may be corrected. (*People v. Hamilton* (1998) 61 Cal.App.4th 149, 156-157.) We will direct the trial court to make the following corrections to the probation report: (1) page one of the report shall list all of the offenses of which defendant was convicted on June 29, 2017; (2) the references to the 2010 convictions and sentence, on page three of the report, shall be stricken; (3) the words "bombarded and" in the first sentence on page 11 of the report shall be stricken; and (4) the sentence which reads, "The defendant induced others to participate in the commission of the crime or occupied a position of leadership or

22

dominance of other participants in its commission" on page 12 of the report shall be stricken.

The judgment is affirmed.  The trial court is directed to correct the probation report as described in this opinion.

_____/S/_____

MAURO, J.

We concur:

_____/S/_____

RAYE, P. J.

_____/S/_____

BLEASE, J.

23